1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    SOHAM BHATIA, et al.,                        Case No.  23-cv-00667-JSC

8                      Plaintiffs,

9          v.                                      **ORDER RE: DEFENDANTS' MOTION
                                                   TO DISMISS, OR, IN THE
                                                   ALTERNATIVE, TO TRANSFER**
10   SILVERGATE BANK, et al.,                      **VENUE**

11                     Defendants.                 Re: Dkt. No. 16

12

13          Plaintiffs sue Silvergate Bank, its parent company, Silvergate Capital Corporation and

14   Silvergate CEO Alan J. Lane (collectively, Silvergate), for aiding and abetting a multibillion-

15   dollar fraud scheme orchestrated by Samuel Bankman-Fried (Bankman-Fried) through the

16   cryptocurrency exchange FTX and the cryptocurrency hedge fund Alameda Research LLC

17   (Alameda).  (Dkt. No. 14.)[1]  Before the Court is Silvergate's motion to dismiss, or, in the

18   alternative, transfer venue.  (Dkt. No. 16).  Having carefully considered the briefing, the Court

19   concludes oral argument is unnecessary, *see* Civ. L. R. 7-1(b), and GRANTS the motion to

20   transfer the action to the District Court of the Southern District of California under 28 U.S.C. §

21   1404.

22                                    **COMPLAINT ALLEGATIONS**

23          Silvergate went "all-in" on cryptocurrency as a deposit niche and emerged as "the leading

24   provider of innovative financial infrastructure solutions and services to participants in the nascent

25   and expanding digital currency industry" with more than $12 billion in interest-free deposits.

26   (Dkt. No. 14 ¶¶ 1, 46, 50-51.)  Crypto customers accounted for as much as 99% of Silvergate

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    Bank's deposits.  (*Id.* ¶ 1.)  The cryptocurrency exchange FTX and cryptocurrency trading firm

2    Alameda, both controlled by Bankman-Fried, accounted for nearly 10% of Silvergate's business.

3    (*Id.* ¶ 2.)

4          FTX collapsed in November 2022, after which Bankman-Fried admitted to diverting

5    billions in customer money to Silvergate accounts controlled by Alameda, where the funds were

6    dissipated and lost.  (*Id.* ¶ 3.)  The revelation of FTX's diversion prompted a run on Silvergate,

7    leading to a record loss of $1 billion and Silvergate's voluntary liquidation.  (*Id.* ¶ 4.)  Plaintiffs

8    allege Silvergate, "which publicly touted its enhanced proprietary anti-money laundering and

9    'Know Your Customer' systems, knew about the scheme," but "accepted Plaintiffs' money and

10   executed transfers by which the money was diverted and dissipated anyway."  (*Id.* ¶ 3.)

11   **I.    Silvergate Exchange Network (SEN)**

12         "Instrumental to [Silvergate's] leadership position and growth strategy" was the Silvergate

13   Exchange Network (SEN), a proprietary payment network geared toward crypto customers

14   through which exchanges like FTX could transfer cryptocurrency nearly instantaneously at any

15   time.  (*Id.* ¶¶ 2, 57-58.)  Before SEN, transactions involving crypto and fiat currencies were slow

16   and burdensome because transferring currency on traditional banking timelines could take days to

17   complete, and such transactions closed only within business hours to allow for due diligence.  (*Id.*

18   ¶ 58.)  Because crypto assets frequently fluctuate in value, transactions considered economically

19   sensible at the time of initiation may not be so sensible at closing days later.  (*Id.* ¶ 59.)  Silvergate

20   released SEN in 2017 to eliminate the friction involved in crypto/fiat transactions.  (*Id.* ¶¶ 60-61.)

21   Participating customers could send money instantaneously to other SEN participants at any time,

22   in part by eliminating the due diligence time built into traditional bank transfers.  (*Id.* ¶ 61.)  All

23   parties to SEN transactions were required to be SEN members and Silvergate account holders, and

24   each transaction was recorded through a notational entry in Silvergate's internal ledger without

25   human involvement.  (*Id.* ¶¶ 62-65.)

26         SEN made Silvergate "the go-to bank for the cryptocurrency industry," and the platform's

27   ease of on-ramping was critical to FTX's growth.  (*Id.* ¶¶ 57, 61, 67.)  Before SEN, the slowness

28   of crypto/fiat transactions impeded the market entry of new users because all on-ramping

transactions required both crypto and fiat currency.  (*Id*. ¶ 60, 66.)  With the 2017 advent of SEN,

new FTX users could begin trading crypto and fiat currency without friction.  (*Id*. ¶ 67.)  SEN

shared a mutual dependence with FTX—an exchange designed and advertised as being easy to use

for crypto newcomers—and other crypto exchanges.  (*Id*. ¶¶ 66, 68.)  In September 2018, digital

currency exchanges accounted for $729.9 million of the deposits on SEN, as compared to $572.7

million from institutional investors and $227.5 million from other customers.  (*Id*. ¶ 68.)  From the

fourth quarter of 2018 to the fourth quarter of 2019, volume on SEN increased 150% to 14,400

transactions, representing $9.6 billion.  (*Id*. ¶ 69.)  Annual SEN transactions grew from $32.7

billion in 2019 to $787.4 billion in 2021—more than 2,700% in two years.  *Id*.

Silvergate acknowledged "SEN is a central element of the operations of our digital

currency related customers, which enables us to grow with our existing customers and to attract

new customers who can benefit from our innovative solutions and services."  (*Id*. ¶ 71.)  Because

deposits from Silvergate's crypto clients were noninterest-bearing, Silvergate could keep all the

returns from investing those deposits.  (*Id*. ¶ 72.)  Indeed, SEN provided Silvergate "a distinctive

advantage over most traditional financial institutions" because it "allow[ed] [Silvergate] to

generate revenue from a conservative portfolio of investments in cash, short term securities and

certain types of loans."  *Id*.  Catering to crypto customers drove Silvergate's funding costs down to

among the lowest in the U.S. banking industry, which allowed Silvergate to generate returns on

lower risk assets through increased investments in interest-earning deposits.  (*Id*. ¶ 73.)  "By the

end of September 2022, Silvergate's crypto-derived, noninterest bearing deposits were 90% of the

bank's overall deposit base, amounting to $11.9 billion.  And of that, FTX alone constituted nearly

10% of the $11.9 billion in deposits, or about $1.2 billion."  (*Id*. ¶ 75.)

**II.    FTX, Alameda, and the Scheme**

Bankman-Fried founded Alameda with Gary Wang in 2017, and the trading firm began

banking with Silvergate around 2018.  (*Id*. ¶ 79.)  Within a year of its founding, Alameda claimed

to be the largest liquidity provider and market maker in the digital asset space, trading between

$600 million to $1 billion a day, roughly 5% of global volume in digital asset trading.  (*Id*. ¶ 85.)

Bankman-Fried, Nishad Singh, and Gary Wang launched FTX, a crypto asset trading platform, in

United States District Court
Northern District of California

United States District Court
Northern District of California

1    2019.  (Dkt. No. 14 ¶ 89.)  Before its 2022 collapse, FTX "operated a multi-billion-dollar mobile

2    application cryptocurrency investment service that offered trading in various options, futures,

3    swaps, and other digital commodity derivative products," along with various other cryptocurrency

4    trading services.  (*Id.* ¶ 90.)  Plaintiffs allege FTX and Alameda moved to Hong Kong in 2019 "in

5    an effort to avoid United States regulatory requirements, including the requirements of the United

6    States securities laws" before relocating to The Bahamas in 2021.  (*Id.* ¶ 95.)  Despite the

7    concomitant risks of banking offshore companies, Silvergate banked both FTX and Alameda.  (*Id.*

8    ¶¶ 96-97.)

9          FTX and Alameda executives represented FTX and Alameda were run separately, but the

10   boundary between the two entities was illusory.  (*Id.* ¶¶ 108-20.)  Both entities lacked adequate

11   risk management, organizational, and governance structures.  (*Id.* ¶¶ 114-20.)  The absence of

12   corporate controls enabled the misappropriation of FTX customer funds.  (*Id.* ¶¶ 121, 155-57.)

13   The Securities and Exchange Commission alleged, and FTX and Alameda executives later

14   admitted, "[f]rom the inception of FTX, [FTX and Alameda] diverted FTX customer funds to

15   Alameda, and continued to do so until FTX's collapse in November 2022."  *Id.*  The entities

16   diverted FTX customer funds by directing FTX customers to deposit fiat currency into bank

17   accounts controlled by Alameda—often Silvergate accounts—and allowing Alameda to use an

18   FTX "line of credit" funded by FTX customer assets.  (*Id.* ¶ 122.)

19         From 2019 to 2022, at Bankman-Fried and FTX's direction, FTX customers deposited

20   billions of dollars in fiat currency into bank accounts controlled by Alameda.  (*Id.* ¶ 123.)  To

21   facilitate the scheme, Bankman-Fried created Alameda Research Ltd., a British Virgin Islands

22   limited corporation that operated as an alter ego of Alameda and FTX, and opened three Silvergate

23   accounts in its name.  (*Id.* ¶¶ 124-25.)  North Dimension Inc., a fully owned and operated shell

24   company owned by Alameda without any legitimate independent business, also received deposits

25   from FTX customers in two Silvergate accounts.  (*Id.* ¶ 126.)  Plaintiffs allege "the pattern of

26   North Dimension's wire transfers—which Silvergate processed—was highly irregular.  FTX

27   customers wired money to North Dimension," where Alameda then commingled the transferred

28   funds with its other assets and used them to fund its trading operations.  (*Id.* ¶ 127.)  Alameda used

United States District Court
Northern District of California

1   the misappropriated FTX customer funds to subsidize Alameda and FTX's operations, speculate in

2   cryptocurrencies and related enterprises, make political donations, purchase real estate, pay

3   outside lenders, and support lavish lifestyles, among other things.  (*Id*. ¶ 132.)  Several FTX and

4   Alameda executives admitted "[t]he use of customer assets by Alameda was not authorized by

5   FTX customers, and FTX customers were not made aware that their assets were being used by

6   Alameda.  To the contrary, FTX's Terms of Service expressly prohibited such use of customer

7   assets."  (*Id*. ¶ 133.)  The scheme, along with FTX and Alameda, collapsed in November 2022.

8   (*Id*. ¶¶ 141-42, 147-50.)

9          Silvergate collapsed soon after.  In November 2021, Silvergate's stock price was $219.75

10   per share.  (*Id*. ¶ 159.)  By December 2022, it had fallen to $21.43.  *Id*.  At the end of the third

11   quarter of 2022, Silvergate had $11.9 billion in crypto-related deposits.  (*Id*. ¶ 160.)  After FTX's

12   collapse, at the end of the fourth quarter of 2022, Silvergate had only $3.8 billion in deposits—a

13   68% drop.  *Id*.  In March 2023, Silvergate discontinued SEN, announced its intention to wind

14   down operations and voluntarily liquidate Silvergate Bank, and closed all non-certificate-of-

15   deposit Silvergate accounts.  (*Id*. ¶ 161.)

16   **III.     Silvergate's Alleged Complicity in the FTX Scheme**

17              **a.   Silvergate's Alleged Knowledge of the FTX Fraud**

18          Plaintiffs allege, "by virtue of its status as a bank and money transmitter, Silvergate was

19   required to develop, implement, and maintain an effective [anti-money laundering] program."  (*Id*.

20   ¶¶ 16-29, 162.)  Silvergate, according to its public filings with the Securities and Exchange

21   Commission, "invested heavily in its risk management and compliance infrastructure," and

22   "attracted a talented, dedicated compliance team with substantial experience in regulated financial

23   institutions, including developing, implementing and monitoring systems to detect and prevent

24   financial crimes."  *Id*.  Silvergate claimed to be "highly selective in [its] customer onboarding

25   process to ensure the integrity of the [SEN] platform," and its onboarding process included

26   extensive regulatory compliance diligence.  (*Id*. ¶ 163.)  In December 2022, Silvergate CEO Alan

27   J. Lane said 1) "Silvergate has instituted and consistently updates and improves a robust

28   compliance and risk management program," 2) "we determine the beneficial owner, the source of

United States District Court
Northern District of California

1    funds, and the purpose and expected use of funds for each and every account we open," and 3)

2    Silvergate Bank "monitors transaction activity for every account and identifies activity outside of

3    the expected usage." (*Id.* ¶ 169.)

4           Silvergate hosted numerous accounts for Bankman-Fried's companies, including eight

5    accounts for Alameda, two accounts for North Dimension, one account for FTX Ventures, and

6    four accounts for FTX Digital Markets. (*Id.* ¶ 170.) In onboarding each of Bankman-Fried's

7    companies, Silvergate obtained information on their beneficial owners, corporate formalities and

8    organization, business operations, assets under management, anticipated volume of transactions

9    per month, source of funds, and principals. (*Id.* ¶ 171.)

10          The Bank Secrecy Anti-Money Laundering Manual summarizes the applicable anti-money

11   laundering compliance program requirements, expectations for risks and risk management,

12   industry sound practices, and examination procedures. (Dkt. No. 14 ¶ 24.) In Appendix F, the

13   manual sets forth "red flags" indicating potential money laundering activities, including

14          (1) funds transfers sent in large, round dollar amounts; (2) funds
15          transfers to or from a financial institution located in a higher risk
             jurisdiction distant from the customer's operations; (3) frequent
16          involvement of multiple jurisdictions or beneficiaries located in
             higher-risk offshore financial centers; (4) repetitive or unusual funds
17          transfer activity; (5) funds transfers sent or received from the same
             person to or from different accounts; (6) unusual funds transfers
18          among related accounts or among accounts that involve the same or
             related principals; (7) transactions inconsistent with the account
19          holder's business; (8) customer use of a personal account for business
             purposes; (9) multiple accounts established in various corporate
20          names that lack sufficient business purpose to justify the account
             complexities; and (10) multiple high-value payments or transfers
21          between shell companies without a legitimate business purpose.

22   (*Id.* ¶ 26.) Plaintiffs allege FTX/Alameda account activity raised the following red flags:

23          • "Unusual transfers of funds occur among related accounts or
              among accounts that involve the same or related principals."
24

25          • "Funds transfer activity is unexplained, repetitive, or shows
              unusual patterns."

26          • "Many funds transfers are sent in large, round dollar, hundred
              dollar, or thousand dollar amounts."
27

28          • "Frequent involvement of multiple jurisdictions or
              beneficiaries located in higher-risk offshore financial

centers."

- "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

- "A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity."

- "A business is reluctant, when establishing a new account, to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business location."

- "A customer is a trust, shell company, or Private Investment Company that is reluctant to provide information on controlling parties and underlying beneficiaries."

- "Purpose of the shell company is unknown or unclear."

- "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

(*Id.* ¶ 172.)

Plaintiffs allege Silvergate and Lane knew Alameda never retained an outside auditor or generated audited financial statements because Silvergate was obligated to review Alameda and FTX's financial statements as a part of routine due diligence. (*Id.* ¶ 174.) Likewise, Plaintiffs allege Silvergate and Lane knew Alameda and FTX failed to observe ordinary corporate formalities because routine due diligence includes requesting a list of each entity's board of directors, the date of every meeting, and board minutes. (*Id.* ¶ 175.) Plaintiffs further allege Silvergate and Lane knew FTX accepted several billion dollars from FTX customers for use in trading on the FTX exchange but diverted those funds to Alameda accounts because Silvergate could see Alameda accounts amassing incremental small dollar deposits from FTX accounts without proportional outflows. (*Id.* ¶ 176.)

> Defendants could and did see for themselves that numerous wires earmarked for deposit to FTX for trading on its exchange were ultimately going to Alameda's trading account. Hedge funds do not generate high volumes of relatively small deposits from a large number of distinct individuals, such as Alameda received through its account at Silvergate, particularly when the firm does not have customers or investors (as Alameda did not). There was no legitimate

> explanation for any of the transfers, much less transfers of the
> frequency and size that were apparent to Silvergate and Lane.
> Similarly, Defendants observed Alameda's failure to segregate
> customer funds on receipt, and the subsequent inexplicable transfers
> of these funds once within Alameda's control in a manner inconsistent
> with its business.

(*Id.* ¶ 177.)  Silvergate continued to bank FTX and Alameda despite the apparent diversion of FTX funds to Alameda; unexplained but frequent transactions between and among FTX, Alameda, and individual executives; absence of internal controls; Alameda's failure to submit to audits or generate financial statements; repetitive and unexplained transfers of funds from FTX and Alameda-related entities to offshore jurisdictions and vice-versa; FTX's and Alameda's move to offshore, lightly regulated jurisdictions; the lack of business experience of FTX and Alameda executives; FTX's and Alameda's failure to staff Chief Financial Officer, Chief Compliance Officer, and Chief Risk Control positions; and the commingling of funds among unrelated accounts.  (*Id.* ¶ 179.)

### b.   Silvergate's Alleged Substantial Assistance of the FTX Fraud

Plaintiffs allege Defendants substantially helped FTX, Alameda, and Bankman-Fried perpetuate fraud.  (*Id.* ¶ 181.)  Silvergate accepted $8 billion in FTX customer assets, maintained fifteen FTX- and Alameda-related accounts, processed billions in transfers from FTX's client accounts to Alameda accounts, and accepted deposits from FTX investors directly into the bank accounts of Alameda and North Dimension.  (*Id.* ¶ 184.)  Lane represented Silvergate conducted significant due diligence on FTX and its related entities, but in the face of several red flags, Silvergate continued to complete transfers and create accounts for FTX and Alameda and allow FTX to use SEN, which "enabled FTX and Bankman-Fried to continue to on-ramp new customers and allow existing customers to trade cryptocurrency."  (*Id.* ¶¶ 185-86, 201-02.)

* * *

Plaintiffs bring claims for 1) aiding and abetting fraud, 2) aiding and abetting breach of fiduciary duty, 3) unjust enrichment, 4) aiding and abetting conversion, 5) violations of Unfair Competition Law under California Business & Professions Code § 17200, and 6) negligence. They seek certification of this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), appointment of Plaintiffs as class representatives and their attorneys as class counsel

United States District Court
Northern District of California

8

1    under Federal Rule of Civil Procedure 23(g), an order requiring Defendants to pay the costs of

2    notice to the class, damages, and reasonable attorneys' fees and costs of litigation.

3                                                    **DISCUSSION**

4            Defendants seek dismissal of Plaintiffs' complaint under Federal Rule of Civil Procedure

5    12(b)(3) and 28 U.S.C. § 1406(a) on the grounds this District is the improper venue for the claims.

6    In the alternative, Defendants seek transfer to the District Court for the Southern District of

7    California under 28 U.S.C. § 1404.  If the Court does not dismiss the complaint pursuant to

8    Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a), or transfer pursuant to 28

9    U.S.C. § 1404, Defendants seek dismissal under Federal Rules of Civil Procedure 9(b) and

10   12(b)(6) on the grounds Plaintiffs fail to state any claim upon which relief can be granted.

11   **I.     Venue**

12           Under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial

13   part of the events or omissions giving rise to the claim occurred."  Plaintiffs lay venue in the

14   Northern District under 28 U.S.C. § 1391(b) because "FTX and Alameda were founded in this

15   District and headquartered in this District until 2019," "[t]he decisions to divert FTX customer

16   funds to Alameda accounts were made in this District and the actions effecting those decisions

17   were taken in this District," and Defendants' marketing and provision of banking and SEN

18   services in this District constitutes substantial, continuous, and systematic contact with this

19   District.  (Dkt. No. 14 ¶ 7.)  Plaintiffs further allege Silvergate opened accounts for Alameda when

20   it was headquartered in Berkeley.  (*Id*. at ¶ 79.)

21           Defendants contest venue in this District on the grounds none of the events or omissions

22   giving rise to Plaintiffs' claims occurred here, none of the named Plaintiffs reside here, and none

23   of the harms caused by Defendants' allegedly tortious conduct were felt here.  Defendants argue

24   Plaintiffs failed to identify any alleged tortious conduct by Defendants in this District, and instead

25   attempt to establish venue based on conduct by FTX and Alameda, neither of which are party to

26   this action.  Even if venue is proper, Defendants request transfer to the Southern District under 28

27   U.S.C. § 1404 because Defendants are located there, Defendants' alleged misconduct occurred

28   there, and most of the evidence exists there.

United States District Court
Northern District of California

1    If the Court concludes venue is improper in this District, it can dismiss the action or

2    transfer to the Southern District of California where, as explained below, it could have been filed

3    in the first instance.  28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case

4    laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice,

5    transfer such case to any district or division in which it could have been brought."); *see, e.g.*,

6    *Kawamoto v. CB Richard Ellis, Inc.*, 225 F. Supp. 2d 1209, 1212–15 (D. Haw. 2002) (finding

7    venue was proper and ordering discretionary transfer under § 1404(a), but noting that even if

8    venue were not proper, transfer under § 1406(a) would be in the interest of justice for similar

9    reasons).  While the Court has serious concerns as to whether venue is proper in this District, it

10   need not finally decide the issue because if venue is improper it would transfer rather than dismiss.

11   And, assuming without deciding venue is proper, the § 1404 convenience factors weigh heavily in

12   favor of transferring this action to the Southern District of California.[2]

### II.    Transfer Under 28 U.S.C. § 1404

14   The Court may transfer this action "[f]or the convenience of parties and witnesses, in the

15   interest of justice" to the Southern District of California if the action might have been brought

16   there.  28 U.S.C. § 1404(a).  Section 1404(a) exists to "prevent the waste of time, energy, and

17   money and to protect litigants, witnesses and the public against unnecessary inconvenience and

18   expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (cleaned up).  District courts have

19   discretion to adjudicate motions for transfer based on an individualized, case-by-case

20   consideration of convenience and fairness.  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498

21   (9th Cir. 2000).  The burden lies with Silvergate, as the movant, to demonstrate jurisdiction and

22   proper venue would exist in the district to which transfer is requested and the balance of

23   conveniences favors transfer.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279

24   (9th Cir. 1979).

25

26   [2] When an action is transferred for improper venue, rather than for convenience, the choice-of-law
     rules of the transferor district apply.  *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983).
27   Since the issue here is whether to transfer from one California district court to another California
     district court, there is no issue as to the forum district; in either case California is considered the
28   forum state.  Thus, whether the Court transfers for improper venue or for convenience factors, the
     result is the same.

United States District Court
Northern District of California

<i>United States District Court<br>Northern District of California</i>

1

**A.      Jurisdiction and Venue in the Southern District of California**

2      The court to which a case is transferred must "(1) be able to exercise personal jurisdiction

3   over the defendants, (2) have subject matter jurisdiction over the claim, and (3) be a proper

4   forum." *Karlen v. Wells Fargo Bank, N.A.*, No. 22-CV-02127-JSC, 2022 WL 2756671, at *2

5   (N.D. Cal. July 14, 2022), *appeal dismissed*, No. 22-16050, 2022 WL 12040241 (9th Cir. Aug. 18,

6   2022).

7      First, the Southern District of California can exercise personal jurisdiction over each

8   Defendant.  A federal court can exercise personal jurisdiction over defendants domiciled within

9   the forum state at the time the action commenced.  *Milliken v. Meyer*, 311 U.S. 457, 462–64

10   (1940).  A corporation is domiciled in its state of incorporation and where it has its principal place

11   of business.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  A

12   bank is a citizen of the state in which its main office is located.  *Rouse v. Wachovia Mortg., FSB*,

13   747 F.3d 707, 715 (9th Cir. 2014); *see* 28 U.S.C.A. § 1348.  Silvergate Bank is a California

14   corporation with its principal place of business in La Jolla, California.  (Dkt. No. 14 ¶¶ 6, 13.)

15   Silvergate Capital Corporation also has its principal place of business in La Jolla, California.  (*Id*.

16   ¶¶ 6, 14.)  Alan J. Lane resides in Temecula, California, and Plaintiffs' claims against him arise

17   from his conduct as the President, Board Member, and CEO of Silvergate Capital Corporation and

18   CEO of Silvergate Bank.  (*Id*. ¶¶ 6, 15.)  Each Defendant is subject to the Southern District of

19   California's exercise of personal jurisdiction.

20      Second, the Southern District of California has subject matter jurisdiction over Plaintiffs'

21   claims.  Plaintiffs assert subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), the

22   Class Action Fairness Act.  (*Id*. ¶ 5.)  Complete diversity of citizenship exists because "at least one

23   member of the proposed plaintiff class is a citizen of a State different than Defendant."  (*Id*. ¶ 5);

24   28 U.S.C. § 1332(d)(2)(A).  Thus, the complaint supports the Southern District of California's

25   exercise of subject matter jurisdiction over Plaintiffs' claims based on diversity jurisdiction.

26      Finally, venue would be proper in the Southern District of California because Defendants

27   are subject to personal jurisdiction there.  28 U.S.C. § 1391(b)(1).

28      This action could have been brought in the Southern District of California.  Indeed,

11

1   Plaintiffs' counsel previously filed three complaints against Silvergate for claims arising from the

2   same alleged conduct in the Southern District of California on behalf of different plaintiffs.[3]

3   **B.  Convenience**

4   In analyzing convenience, the Court may consider:

5   > (1) plaintiffs' choice of forum, (2) convenience of the parties, (3)
6   > convenience of the witnesses, (4) ease of access to the evidence, (5)
     > familiarity of each forum with the applicable law, (6) feasibility of
7   > consolidation with other claims, (7) any local interest in the
     > controversy, and (8) the relative court congestion and time to trial in
8   > each forum.

9   *Jones*, 211 F.3d at 488-89; *see also Avery v. TEKsystems, Inc.*, No. 22-CV-02733-JSC, 2022 WL

10   3998499, at *4 (N.D. Cal. Aug. 31, 2022) (listing convenience factors).

11   While great weight is generally accorded to a plaintiff's choice of forum, the forum choice

12   of a named plaintiff seeking to represent a class is given less weight.  *Lou v. Belzberg*, 834 F.2d

13   730, 739 (9th Cir. 1987).  The force of Plaintiffs' forum choice depends on the extent of their

14   contacts with the forum, including those related to the cause of action.  *Id.*; *see Pac. Car &*

15   *Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968) ("Plaintiff's choice of forum, then, is not

16   the final word.  In judging the weight to be given such a choice . . . consideration must be given to

17   the extent both of the defendant's business contacts with the chosen forum and of the plaintiff's

18   contacts, including those relating to his cause of action.").  "If the operative facts have not

19   occurred within the forum and the forum has no interest in the parties or subject matter,"

20   Plaintiffs' forum choice is entitled to only minimal consideration.  *Lou*, 834 F.2d at 739.

21   Because Plaintiffs do not reside in California and seek to represent a class, their choice of

22   forum is granted little to no deference. (Dkt. No. 14 ¶¶ 9-12); *Lou*, 834 F.2d at 739 ("Although

23   great weight is generally accorded plaintiff's choice of forum, when an individual brings a

24

25   ────────────────────
[3] *Zuleta v. Silvergate Capital Corp., et al.*, Case No. 22-cv-1901 (filed Dec. 1, 2022) (voluntarily
26   dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on
     February 9, 2023); *Gonzalez v. Silvergate Bank, et al.*, Case No. 22-cv-1981 (filed Dec. 14, 2022)
27   (voluntarily dismissed without prejudice pursuant to Federal Rule of Civil Procedure
     41(a)(1)(A)(i) on February 10, 2023); *Husary v. Silvergate Bank, et al.*, Case No. 23-cv-0038
28   (filed Jan. 9, 2023) (voluntarily dismissed without prejudice pursuant to Federal Rule of Civil
     Procedure 41(a)(1)(A)(i) on February 9, 2023).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    derivative suit or represents a class, the named plaintiff's choice of forum is given less weight."

2    (cleaned up)); *Easton v. Wells Fargo & Co.*, No. 20-CV-02193-HSG, 2020 WL 3639934, at *3

3    (N.D. Cal. July 6, 2020) ("Although Plaintiff's choice of forum is generally entitled to some

4    deference, the degree of deference is substantially diminished in several circumstances. These

5    include where: (1) the named plaintiff represents a class, (2) the plaintiff resides outside of the

6    chosen forum, and (3) the conduct giving rise to the claims occurred in a different forum."

7    (cleaned up)).

8           Further, Plaintiffs do not allege they had any contacts with the Northern District of

9    California related to their claims. *Pac. Car & Foundry Co.*, 403 F.2d at 954.  Plaintiffs accuse

10   Silvergate of tortious conduct arising from Silvergate's relationship with FTX and Alameda,

11   which were both founded and began banking with Silvergate in this District.  But Plaintiffs do not

12   allege they had any contact with either FTX or Alameda when these companies were based in

13   Northern California.  Plaintiffs' earliest alleged interaction with Defendants is November 2021,

14   when Plaintiff Gonzalez began placing funds in an FTX account at Silvergate.  Alameda and FTX

15   had moved to Hong Kong years earlier, in November 2019, before relocating to The Bahamas in

16   November 2021.  (Dkt. No. 14 ¶ 95.)  So, Plaintiffs' choice of forum is given only minimal

17   consideration.

18          On balance, the other relevant convenience factors favor transfer.  Plaintiffs' convenience

19   is entitled to lesser weight because Plaintiffs chose to sue in a forum where they do not reside.

20   *Easton*, 2020 WL 3639934, at *3.  No defendants reside in the Northern District of California and

21   the entity defendants are located in the Southern District of California.  Silvergate's winding down

22   of its operations and voluntary liquidation is taking place primarily in the Southern District.  If

23   anywhere, the "center of gravity" of Plaintiffs' case is the Southern District of California, where

24   most of Defendants' alleged misconduct is likely to have occurred, key witnesses and evidence are

25   likely to be found, and where (or closer to where) counsel are located.  (*See* Dkt. No. 16-4 at 2);

26   *Easton*, 2020 WL 3639934, at *4 ("[L]itigation should proceed where the case finds its center of

27   gravity, which can substantially reduce litigation costs." (cleaned up)).  While convenience of

28   counsel is not relevant, the litigation costs will be lower if this case is litigated in the district, and

1    near the district, where most of the attorneys reside. *See Shields v. Amerigas Propane, Inc.*, No.

2    2:15-CV-00754-KJM, 2015 WL 5436772, at *5 (E.D. Cal. Sept. 15, 2015). Plaintiffs do not argue

3    this District is more convenient for them than the Southern District, and only mention, without

4    identifying by name, Alameda employees who worked in Berkeley as potential nonparty witnesses

5    whose attendance may need to be compelled at trial.

6           The familiarity of each forum with the applicable law is neutral because both forums are

7    federal courts located in California equally familiar with California and federal law. The

8    feasibility of consolidation with other claims also weighs neutrally. Because Plaintiffs do not

9    reside in the Northern District and have not alleged any contacts with this District related to this

10   cause of action, the local interest in this controversy is minimal. The Southern District's interest

11   in this controversy is much stronger, as the case involves entities headquartered there.

12                                          **CONCLUSION**

13          Plaintiffs' choice of forum weighs against transfer, but is entitled to little or no deference

14   because this is a putative class action, Plaintiffs do not reside in this District, Plaintiffs have not

15   alleged contacts with this District related to their case, and Plaintiffs have not suffered any alleged

16   injuries in this District. The Southern District of California is the more appropriate venue for this

17   action considering the convenience of the parties and witnesses, ease of access to evidence, and

18   local interest in the controversy. The Court finds that, even if venue is proper here, the factors

19   under § 1404 favor discretionary transfer to the Southern District of California, where this case

20   could have been brought. Accordingly, the Court GRANTS Defendants' motion to transfer to the

21   District Court of the Southern District of California under 28 U.S.C. § 1404.

22

23          This Order disposes of Docket No. 16.

24          **IT IS SO ORDERED.**

25   Dated: August 1, 2023

26

27                                                          JACQUELINE SCOTT CORLEY
28                                                          United States District Judge

*United States District Court*
*Northern District of California*

14